**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRYCE CORPORATION,<br><br>            Plaintiff,<br><br>vs.<br><br>XL INSURANCE AMERICA, INC.,<br><br>            Defendant. | Case No.: 1-23-cv-1814<br><br>**COMPLAINT FOR:**<br><br>  **1) DECLARATORY JUDGMENT**<br>  **2) BREACH OF CONTRACT**<br>  **3) BAD FAITH**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Bryce Corporation ("Bryce"), by its undersigned counsel, brings this action against Defendant XL Insurance America, Inc. ("XL"), and in support thereof, alleges as follows:

## NATURE OF ACTION

1.      This action arises out of XL's breach of contract in refusing to indemnify Bryce, under all-risk commercial property policy number US00027574PR21A, sold for the period June 15, 2021 to June 15, 2022 (the "XL Policy"), for covered losses suffered as a result of two separate fires at Bryce's primary production facilities in Tennessee and Arkansas.  Bryce timely submitted claims for Property Damage, Business Interruption, Extra Expense, Expense To Reduce Loss and other covered losses arising in connection with these fires.  XL, putting forth a shifting roster of excuses, has unreasonably rejected its obligations to fully compensate Bryce in a timely manner for these covered losses, in bad faith breach of the XL Policy.

2.      Bryce seeks damages, including consequential damages, for XL's breaches of contract.  Bryce also seeks a judgment declaring the scope of XL's obligation to pay Bryce's losses under the XL Policy.  Last, Bryce seeks damages including punitive damages for XL's bad faith

breaches of contract, XL's actions in its investigation and adjustment of Bryce's claims and XL's failure to timely compensate Bryce for its covered losses.

## PARTIES

3.     Bryce Corporation is a corporation incorporated under the laws of the state of Tennessee that maintains its principal place of business in Memphis, Tennessee.

4.     XL Insurance America, Inc. is a Delaware corporation with its principal place of business in Connecticut.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper in this Court under 28 U.S.C. § 1391 because the parties, per the terms of the XL Policy, have mutually agreed and consented to bring all suits concerning disagreements under that policy in a court of competent jurisdiction within the State of New York. *See* Ex. A. at 38 of 52.

## BACKGROUND

1.     **BRYCE CORPORATION**

7.     Bryce is an industry leader in film conversion and the production of innovative flexible packaging.  Bryce creates packaging products for customers in the food, snack, pet care, household, and health and beauty industries.  In its operations, Bryce relies upon large, specialized printing presses located at the two facilities that suffered fires in November 2021.

8.     As part of its prudent business practices, Bryce has, for a number of years, purchased property insurance from XL, including the XL Policy, which provides coverage for damage to buildings, equipment and stock and associated losses of income and expenses incurred

from all risks, including fire.  Bryce's losses in this case arise from fire, which is undeniably a covered cause of loss under the XL Policy.

2.    THE FIRES IMPACTING BRYCE'S BUSINESS OPERATIONS

9.    On November 14, 2021, a fire damaged Bryce's property, including the P2-4 press, in Searcy, Arkansas (the "Searcy Fire").  The Searcy Fire caused substantial other damage to property and equipment, and caused Bryce to suffer Business Interruption losses and to incur additional expenses.  Bryce gave XL timely notice of its losses from the Searcy Fire.

10.    On November 15, 2021, a fire damaged Bryce's property including the P3-4 press in Memphis, Tennessee (the "Memphis Fire").  The Memphis Fire caused substantial other damage to property and equipment, and caused Bryce to suffer Business Interruption losses and to incur additional expenses.  Bryce gave XL timely notice of its losses from the Memphis Fire.

11.    As a result of the two separate fires, Bryce had to arrange to purchase replacements for the P2-4 and P3-4 presses, had to repair its damaged buildings, and had to replace damaged stock and equipment.  These presses are extremely expensive pieces of specialized equipment, which take a long time to construct and deliver, particularly with the supply chain disruptions that have been caused by the global COVID-19 pandemic.  XL delayed approval of a new manufacturing facility to house these new presses, herein referred to as Plant 10, by over 6 months.  The construction of Plant 10 to house permanent replacements of the P2-4 and P3-4 presses allowed Bryce to avoid significant Business Interruption loss, because installing them where they had been located would have further disrupted business operations.  XL's delay in approval of Plant 10 delayed the installation of the replacement presses thereby causing Bryce additional losses.  Finally, Bryce incurred substantial Extra Expenses and Expenses To Reduce Loss – its ongoing and substantial Business Interruption losses – to purchase a temporary press and to install it.

12.    Bryce's losses from the Searcy Fire and Memphis Fire are still being incurred and calculated, but are anticipated to exceed $86,000,000.

13.    Due to XL's breaches of contract, including its refusal to make proper and customary advances so that Bryce could further mitigate its losses caused by the fires, and XL's failure timely to commit to pay for repair and replacement of damaged property, Bryce incurred and continues to incur additional Business Income loss and consequential damages, totaling tens of millions of dollars, that could have been avoided had XL acted in a timely and good faith fashion.

**3.    THE XL POLICY**

14.    In exchange for a substantial premium, XL sold Bryce the XL Policy, in which XL agreed to indemnify Bryce for Property Damage, Business Interruption, Extra Expense and Expense To Reduce Loss and other losses.  A true and correct copy of the XL Policy is attached as Ex. A.

15.    As a result of the sale of the XL Policy, XL owes a duty of good faith and fair dealing, as well as fiduciary duties, to Bryce.

16.    The XL Policy's indemnity limit is $400 million per occurrence, which is subject to a deductible and certain sublimits.  Ex. A at 2 of 52.

17.    The XL Policy broadly covers "direct physical loss of, or direct physical damage to, first-party property and directly resulting effect on income and expense as more specifically provided for in the sections below."  Ex. A at 12 of 52.

18.    The XL Policy contains a "physical property" valuation provision for Property Damage, which sets forth Bryce's entitlement to the Replacement Cost of destroyed property:

IV.    **Physical Property Valuation**

Unless another basis of valuation is specified in this section for a type of property, the Insured shall report to the Company the values of property to be insured under this policy at the current cost to replace it in full. If another basis is specified, the Insured shall report to the Company the values of the property on that basis. In the event of any Damage to Insured Property from an Insured Cause of Loss, the Insured's claim shall be valued (at the time and place of Damage) as follows:

A.    **Buildings, Structures, Furniture, Fixtures, Machinery and Equipment**

If repaired, rebuilt or replaced within two (2) years from the date of Damage, at the same or at another site (within the same country), the amount of the claim shall be calculated at Replacement Cost.

If the damaged property is not fully repaired, rebuilt or replaced within two (2) years from the date of Damage, the amount of the claim shall not exceed the Actual Cash Value of the damaged property.

If Damage involves any Insured Property that is obsolete or no longer useful for its intended purpose, the amount of the claim shall be limited to the Actual Cash Value of the damaged property.

Ex. A. at 17-18 of 52.  Under this provision, when its property is damaged as it was in the fires, Bryce is immediately entitled to recover the Actual Cash Value of that property, and is thereafter entitled to recover the difference between the Actual Cash Value and the Replacement Cost when Bryce commits to replace the property.

19.    The XL Policy contains a Time Element section, which includes coverage for Business Interruption (Ex. A at 21 of 52), Extra Expense (Ex. A at 22 of 52), and Expense To Reduce Loss ("Expenses Proven To Reduce Loss") (Ex. A at 25 of 52).

20.    Under the XL Policy, Business Interruption covers "[t]he necessary interruption of the Insured's business."  Ex. A at 21 of 52.  The Business Interruption coverage in the XL Policy covers Bryce for both its loss of profits and its continuing, non-variable expenses.  Because Bryce

cannot continue in business without full income to support its continuing expenses, under applicable law, XL is obligated to pay Business Interruption losses promptly and on an as-incurred basis. *Bi-Economy Market, Inc. v. Harleysville Ins. Co.*, 886 N.E.2d 127, 131-32 (N.Y. 2008). The purpose of Business Interruption and associated Time Element insurance coverages is to do for the policyholder what it would have done but for a catastrophe, and to permit the policyholder to avoid further losses and get back into normal operation as soon as possible.

21.     Historically, insurance companies have provided Business Interruption coverage on a Gross Earnings basis to policyholders operating in the United States, and on a Gross Profit basis to policyholders operating in the United Kingdom, Canada and elsewhere.

22.     Additionally, the property insurance policies XL sold to Bryce from 2013 to 2020 permitted Bryce to claim Business Interruption loss under **either** a Gross Earnings or Gross Profit basis; *i.e.*, to choose the method which **maximized** its recovery.

23.     Unlike the policies XL had historically sold to Bryce from 2013 to 2020, the XL Policy provides that whether XL provides coverage on a Gross Earnings or Gross Profits basis will be determined by the manner in which Bryce submitted underwriting records to XL, and further provides that if this is unclear, XL may choose the approach that **minimizes** XL's obligations to pay Business Interruption loss:

> 1.     If the underwriting records establish to the Company's satisfaction that the Insured submitted values for business interruption at the specific Insured Premises based on Gross Earnings or Gross Profit, then business interruption shall be calculated on the basis established by those records.
>
> 2.     If the underwriting records do not establish to the Company's satisfaction that the Insured submitted values for business interruption at the specific Insured Premises based on Gross Earnings or Gross Profit, then the method producing the lesser business interruption claim shall be used in the calculation.

Ex. A at 21 of 52.  This was a dramatic and undisclosed change in the coverage XL sold to Bryce, which XL first inserted in the 2020-2021 policy.  XL did not, as it was obligated to do under

applicable law and as part of the duty of good faith and fair dealing it owed to Bryce, alert Bryce to this change.  To the contrary, XL affirmatively stated that there were no material changes between the 2019-2020 and 2020-2021 all-risk policies it sold Bryce.  XL also included its undisclosed, unilateral change in the Business Interruption provision in the renewal for the 2020-2021 all-risk policy, being the XL Policy.

24.     Moreover, XL did not provide Bryce with a copy of the final version of the XL Policy until well after the policy period for it had incepted, although it is the custom and practice of the insurance industry to provide a copy of the policy in advance of its inception.

25.     The XL Policy sets forth different mechanisms for calculating Gross Earnings and Gross Profit:

> Consistent with these agreements, any claim shall be calculated on one of the following methods:

> **(a)     Gross Earnings Method**

> The actual loss sustained by the Insured directly resulting from such interruption of business, but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business.

> Due consideration shall be given to the continuation of Normal charges and expenses, including payroll expenses as reported by the Insured in its most recent pre-Damage statement of values to the Company, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the Damage.

> **(b)     Gross Profits Method**

> The actual loss sustained by the Insured due to the loss of Gross Profit resulting from (i) reduction in Sales and (ii) increase in cost of doing business. The amount payable as indemnity hereunder shall be as follows:

> (1)     The reduction of Sales shall be the sum produced by applying the Rate of Gross Profit to the amount by which the Sales during the Indemnity Period shall fall short of the Standard Sales; and

(2)    The increase in cost of doing business shall be the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the reduction in Sales which, but for that expenditure, would have taken place during the Indemnity Period, but not exceeding the sum produced by applying the Rate of Gross Profit to the amount of the reduction thereby avoided;

all less any sum saved during the Indemnity Period with respect to such of the Insured Fixed Charges as may cease or be reduced because of such interruption of business.

In calculating Gross Profits:

(1)    If any Fixed Charges of the business are not insured under this policy, then, in computing the amount of recovery hereunder as increase in cost of doing business, that proportion only of the additional expenditure shall be recoverable hereunder which the sum of the Net Profit and the insured Fixed Charges bears to the sum of the Net Profit and all the fixed charges.

(2)    If during the Indemnity Period goods shall be sold or services shall be rendered elsewhere than at the Insured Premises where Damage occurred for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such Sales or services shall be included in arriving at the amount of Sales during the Indemnity Period. The Insured agrees to use any suitable property or service owned or controlled by the Insured or obtainable from other sources in order to continue Sales and reduce the loss of Gross Profits under this policy.

Ex. A. at 21-22 of 52.

26.    For Gross Profits, the Indemnity Period during which XL owes Business Interruption coverage is putatively capped at 12 months:

The period beginning with the date of the Damage to Insured Property and ending not later than twelve (12) months thereafter (except as otherwise specifically provided in the Declarations of this policy or as per the accepted reported period of months on file with the Company) during which period the results of the business shall be directly affected in consequence of the Damage.

Ex. A. at 46 of 52.

27.     For Gross Earnings, the Period of Indemnity during which XL owes Business Interruption coverage is capped only by the time necessary with due diligence and dispatch to replace destroyed property:

> Any Time Element coverage is limited to the length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property as has been damaged. The period of indemnity commences with the date of Damage, or as applied to contingent Time Element the date of Contingent Damage. A period of indemnity commencing during the Policy Term continues during the period of due diligence and dispatch which may extend beyond the Policy Term.

Ex. A. at 24 of 52.

28.     The XL Policy provides up to the policy limit of $400,000,000 per Occurrence for Business Interruption.  Ex. A at 2 of 52.

29.     The XL Policy provides "Extra Expense" coverage, sublimited at $25,000,000 per occurrence, as follows:

**B.     Extra Expense**

> Extra expense incurred by the Insured after Damage to the extent necessary to continue as nearly as practicable the Normal operation of the Insured's business at the Insured Premises where the Damage took place.

> Extra expense shall be the reasonable and necessary excess (if any) of the total cost incurred as a result of Damage during the period of indemnity chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no Damage occurred.  Any salvage value of property obtained for temporary use during the period of indemnity which remains after the resumption of Normal operations shall be taken into consideration in the adjustment of any extra expense claim.

Ex. A. at 22 of 52.

30.     Furthermore, the XL Policy contains the following Expenses To Reduce Loss provision:

### D.    Expenses Proven to Reduce Loss

To the extent not specifically provided for elsewhere in the Time Element **Section**, if the Insured incurs expenses proven to reduce the amount of any covered claim otherwise recoverable under this policy, then the amount of those expenses are insured:

1.    Where necessarily incurred for the purpose and effect of reducing Time Element loss under this policy; and

2.    Where incurred, in excess of Normal, for the purpose and effect of replacing any Finished Stock that was used to reduce Time Element loss under this policy;

but in no event shall the aggregate of such expenses exceed the amount by which the Time Element loss otherwise payable under this policy actually was reduced.

Ex. A. at 25 of 52.  The XL Policy contains no sublimit for this coverage, but caps recovery at the amount of Time Element loss avoided.

31.    The XL Policy further provides coverage for costs relating to the preparation of a claim under the XL Policy:

### G.    Professional Fees

The necessary and reasonable expenses actually incurred by the Insured, of fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals for the sole purpose of producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from a covered claim.

The amounts insured hereunder do not include fees or costs of: (i) attorneys, public adjusters and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them; (ii) the costs of using the Insured's employees; and (iii) loss consultants who provide consultation on coverage or negotiate claims.

Ex. A. at 17 of 52.  The XL Policy contains a $100,000 per occurrence sublimit for Professional Fees.  Ex. A at 2-3 of 52.

32.    The XL Policy provides that "New York law shall control the interpretation, application and meaning of this contract, whether in suit or otherwise."  Ex. A. at 39 of 52.  This

clause does not state, however, that New York law will control evaluation of XL's conduct in adjusting or otherwise responding to Bryce's claims for coverage, conduct that did not occur in New York and has no connection to New York.

33.     The XL Policy additionally contains a choice of forum provision, placing disputes requiring judicial resolution, including this matter, within the jurisdiction of New York courts:

**H.     Suit and Choice of Law**

In the event that any disagreement arises between the Insured and the Company requiring judicial resolution, the Insured and the Company each agree that any suit shall be brought and heard in a court of competent jurisdiction within the State of New York. The Insured and the Company further agree to comply voluntarily with all the requirements necessary to give such court jurisdiction. Any suit shall be barred (i) if commenced before the Insured has given notice and permitted the Company reasonable opportunity for adjustment; or (ii) if commenced more than twenty-four (24) months after the inception of Damage unless the Company agrees in writing after Damage to extend that suit limitation period.

Ex. A. at 38 of 52.

34.     Fire is a covered cause of loss that is not otherwise excluded under XL's Policy.

35.     The XL Policy defines the term Occurrence as "[t]he physical source of Damage to Insured Property, regardless whether it creates more than one Insured Cause of Loss." Ex. A. at 41 of 52. As the Searcy Fire and the Memphis Fire were separate and distinct events, and were different sources of damage to Bryce's property, they constitute separate Occurrences under the XL Policy.

**4.    B</small>RYCE'S C</small>LAIMS AND S</small>ATISFACTION OF C</small>ONDITIONS P</small>RECEDENT**

36.     The premium for the XL Policy was $821,124.00, and Bryce has paid all premium due under the XL Policy.

37.     On November 15, 2021, Bryce provided timely notice of its claim under the XL Policy to XL for loss and damage caused by the Searcy Fire.

38.     On November 16, 2021, Bryce provided timely notice of its claim under the XL Policy to XL for loss and damage caused by the Memphis Fire.

39.     Bryce has complied with or, at a minimum, substantially complied with, all applicable terms and conditions of the XL Policy and/or applicable law, or is or was otherwise legally or factually excused from doing so.

**5.      XL'S FAILURE TO PAY BRYCE'S FULL LOSS AND DAMAGE**

**(a)     Bryce Has Suffered Property Damage and Business Interruption Losses, and Incurred Substantial Extra Expenses and Expenses To Reduce Loss from the Fires.**

40.     As a result of the fires, Bryce suffered damage to much of its property, including the P3-4 and P2-4 presses.  Bryce is entitled to claim the Replacement Cost of those presses and other property.  Under the XL Policy's valuation provisions, the manner in which Bryce is entitled to make a Replacement Cost claim is that Bryce makes a claim for the Actual Cash Value of the destroyed property, finances the replacement if possible, and then makes a claim for the difference between the Actual Cash Value and the Replacement Cost when it has paid for or committed to pay for replacement.  The Actual Cash Value of the P2-4 and P3-4 presses, which the parties agree were destroyed, along with other property damaged and destroyed in the Searcy Fire and Memphis Fire, is more than $6,000,000.  The full Replacement Cost of these presses and property will be in excess of $14,000,000.

41.     As the cost of the replacement presses is substantial, and it takes a long time for the manufacturers to deliver the presses, it was critical to Bryce that XL (1) commit to paying for their full Replacement Cost in a timely basis and (2) advance sufficient funds for Bryce to finance their purchase.  XL did neither in bad faith breach of the XL Policy.

42.     Further, in order to mitigate its damages as reasonably as possible, Bryce proposed to build Plant 10 to house the permanent replacements, as this would lower Bryce's Business

Interruption loss, and XL's consequent obligations to pay that loss, by minimizing further disruption at the locations where the destroyed presses had been housed.

43.      In a further effort to mitigate its losses, Bryce purchased a small replacement press, which the parties agreed served to reduce Bryce's Business Interruption loss, and Bryce built out one of its properties to house this replacement press.  The cost of doing so, covered by the Extra Expense and Expense To Reduce Loss provisions and other provisions in the XL Policy and under applicable law, was more than $4,500,000.

44.      Despite Bryce's best efforts to convince XL to honor its obligations under the XL Policy, XL delayed approving these costs for several months, thereby breaching the XL Policy and causing Bryce to suffer additional losses and to incur additional costs.

45.      In addition, Bryce has suffered Business Interruption losses that, through November 2022, were approximately $31,000,000, and Bryce anticipates, as of the date of this Complaint, that its full Business Interruption losses will total $56,000,000.  Bryce's Business Interruption losses have been caused by the fires, as well as XL's delays in (1) adjusting Bryce's losses; (2) committing to paying for covered loss, costs and damages; and (3) advancing sufficient funds to purchase replacement property and to mitigate its losses.

46.      Bryce has incurred covered Extra Expenses in excess of $16,700,000.

47.      Bryce has incurred Claim Preparation fees amounting to at least $500,000, in excess of the combined $200,000 in limits for the two occurrences at issue.  Bryce has had to incur much of the excess as a result of XL's breaches of contract.

48.      In total, Bryce projects its total covered losses will exceed $86,000,000 net of the deductible in the XL Policy.  As of the filing of this Complaint, XL has advanced only $26,845,408.

**(b)**    **In Breach of the XL Policy and Its Obligations under Applicable Law, XL Refused and Rebuffed Bryce's Demands for Timely Payment of Its Losses.**

49.    After providing timely notice of its losses from the fires, Bryce immediately requested advances from XL under: (1) the Property Damage provision of the XL Policy to pay for the Actual Cash Value of the destroyed P3-4 and P2-4 presses and other destroyed property: (2) the Business Interruption to pay for Bryce's continuing expenses and for its losses of income; and (3) the Extra Expense and Expense To Reduce Loss provisions to pay for the acquisition and installation of a temporary press to mitigate Bryce's Business Interruption losses, along with the necessary costs to build out of property to house that temporary press.

50.    On December 29, 2021, XL authorized a $5,000,000 advance for the loss and damage caused by the Searcy Fire and a $4,000,000 advance for the loss and damage caused by the Memphis Fire.  The replacement presses could not ordered until after these advances were received on January 11, 2022.

51.    Bryce proposed to XL that Bryce mitigate continuing Business Interruption loss through purchase of a temporary press and buildout of surviving property to house that press.  This press was not ordered until January 18, 2022 after receiving approval from XL.

52.    In February 2022, Bryce proposed to XL that it build Plant 10 to house the replacement presses for P3-4 and P2-4 rather than further disrupting Bryce's operations by installing them into the buildings in which the original presses had been located.  Bryce demonstrated to XL, and XL acknowledged, that had Bryce replaced P3-4 and P2-4 in their original locations, the resulting Business Interruption loss, even if confined to the calendar year after the fires, would have been much larger than that incurred during the period needed to build Plant 10 and install the permanent replacement presses in that building.  Despite this, XL delayed

providing its final agreement to this plan for several months, from February 2022 to October 2022, during which time Bryce continued to suffer massive losses of income.

53.    XL's $9,000,000 advance was far too small to permit Bryce to cover its ongoing costs and to finance the mitigation of its loss and the replacement of its destroyed property. Accordingly, on March 14, 2022, Bryce requested XL to make an additional advance payment totaling $8,000,000.

54.    XL refused to make the $8,000,000 advance payment.  As shown below, thereafter, XL has offered varied and shifting excuses for its refusal to pay, on a timely basis, Bryce's Property Damage and Business Interruption losses, amounts incurred as Extra Expense and Expense To Reduce Loss, as well as other losses and costs.

> (i)    **XL Has Asserted, Without Basis, Its Right To Avoid Further Business Interruption, Extra Expense and Expense To Reduce Loss Payments to Bryce by Confining Bryce to a Gross Profits Business Interruption Recovery.**

55.    XL's first position was that, under the XL Policy, either the "underwriting records" demonstrated that Bryce "submitted values for business interruption at the specific Insured Premises based on [a] Gross Profit" basis, or did not "establish" to XL's "satisfaction that Bryce had submitted values under a Gross Earnings basis, and therefore that XL was entitled to choose the Gross Profits valuation, as it was "the method producing the lesser business interruption claim."

56.    XL further took the position that Bryce's substantial Business Interruption losses would, under a Gross Profits basis, be capped at the amount of Business Interruption lost in the one-year Indemnity Periods running from the date of the fires, and further that Bryce's Extra Expenses and Expense To Reduce Loss would be capped at the amount of Business Interruption avoided in those one-year Indemnity Periods.

57.     This was despite the fact that XL ultimately agreed to Bryce's plan to construct Plant 10 and install the permanent replacement presses in Plant 10, which plan would reduce both Bryce's losses and XL's indemnity obligations, but which would take longer than 12 months from the fires to complete.

58.     XL raised this coverage defense for the first time at a meeting on March 23, 2022, and used it to reject Bryce's demand for a further $8,000,000 advance.  XL further stated that it would refuse to make any additional advances until it had completed its evaluation of this new asserted defense.

59.     One week later, on April 1, 2022, Bryce's broker responded to XL's coverage defense, stating that XL was inappropriately withholding further advances needed by Bryce to finance the temporary and replacement machinery based upon a misreading of the XL Policy. Alternatively, Bryce's broker stated that if XL was correct that, as written, the XL Policy entitled XL to impose a Gross Profit Business Interruption recovery upon Bryce, the policy provision under which it justified this limitation was unenforceable as a limitation of coverage, because XL had imposed it on renewal in 2020-2021 without notice to Bryce, in contravention of applicable law. Indeed, XL had in fact expressly represented that the 2020-2021 renewal, and thus the XL Policy, contained no changes to coverage.

60.     XL promised to respond to this letter by May 5, 2022, and further stated that it would make no further advances until its legal counsel had time to respond to the points made in the letter.  As noted below, XL **never** substantively responded to the April 1, 2022 letter.

61.     In relation to Bryce's need for additional money to finance its recovery, XL further stated that Bryce should have allocated XL's otherwise unallocated advances toward replacement of the P3-4 and P2-4 presses and payment for the temporary replacement press, and that, had Bryce

not used its advances to pay for cleanup costs and unavoidable continuing expenses – costs which XL was likewise obligated to pay on a timely basis so as to permit Bryce to continue operations as normally as possible – Bryce would have had enough to pay for those presses.

62.    In other words, XL conceded it had not timely paid the full amount of what it owed Bryce, but that Bryce should have foreseen XL's breach, forgone incurring necessary costs, and allocated XL's inadequate payments toward replacement of the destroyed presses.

63.    As Bryce continued to incur additional damages from XL's ongoing breach, on May 20, 2022, Bryce's counsel wrote a letter to XL both detailing the full amount of covered loss and costs XL had failed to pay and requesting a substantive response to the points made in the broker's letter of April 1, 2022.

64.    Despite promising to do so, XL never provided this written explanation for the factual and legal bases for its argument that it is entitled to slash Bryce's Business Interruption, Extra Expense and Expense To Reduce Loss recovery by capping all three within the one-year Indemnity Period governing Gross Profits recovery.  XL did send letters on May 27, 2022 and August 2, 2022 that referenced the issue – because it was the basis upon which it was withholding millions of dollars from Bryce – but neither of those letters addressed the factual and legal basis of XL's position, and XL has not provided such explanation as of the date of this Complaint.

65.    Indeed, in its letter of May 27, 2002, XL requested Bryce to supply it with documents to support the claim that XL had inserted a new Business Interruption clause into the policies it sold including the XL Policy without alerting Bryce to the change, and further that XL had affirmatively informed Bryce that the 2020-2021 renewal, and thus the XL Policy, contained no policy changes, *despite the fact that XL authored those documents.*  XL was then delaying, and continues to delay, full payment of Bryce's Time Element loss on an argument for which it has

offered no factual or legal support despite multiple requests over the past year prior to the filing of this Complaint.

66.     Consistent with its general refusal to advance money to Bryce, XL paid Bryce nothing on its Business Interruption claim from November 2021 to July 2022, when it advanced $2,500,000 on Bryce's existing Business Interruption loss, which by that date exceeded $16,000,000 (including unavoidable expenses).

67.     Further to this, even if XL can somehow confine Bryce to a Gross Profits Business Interruption recovery, XL's substantial delay in adjusting Bryce's loss is a breach of contract, which entitled Bryce to recover all losses as consequential damages.  Additionally, XL's ultimate agreement to Bryce's plan to replace its damaged property by constructing Plant 10, itself untimely, precludes and/or estops XL from refusing to pay Bryce's claim in full.

> **(ii)     XL Wrongfully Asserted that Bryce's Claimed Business Interruption Losses Were Attributable Not to the Fires but to Higher Raw Materials Costs.**

68.     In early July 2022, XL's accounting expert, J.S. Held, questioned the value of Bryce's Business Interruption loss by asserting that the reduction in profit margins after the fires was attributable to higher raw material prices, rather than the fires.

69.     On July 14, 2022, Bryce's forensic accountant Berkeley Research Group ("BRG") responded to XL's new coverage defense, sending XL an analysis of Bryce's Business Interruption loss that demonstrated that Bryce's lower profit margins after the fires were not, as XL claimed, a result of higher raw material prices.

70.     XL's position that Bryce's lower profit margins resulted from higher material costs, rather than the fires, is incorrect and objectively unreasonable.  As is commonplace, Bryce passed raw material costs on to customers and historically higher raw material prices only affected profit

margins in the very short-term.  BRG's analysis demonstrated that lower profit margins were attributable to the fires.

71.    J.S. Held, which raised the issue, never responded to BRG's analysis.  This was a pattern for XL and J.S. Held:  over the course of the last sixteen months, J.S. Held and/or XL have refused to respond to documents submitted by Bryce demonstrating its losses and disproving XL's shifting coverage defenses.

    (iii)    **XL Wrongfully Sought To Confine Bryce's Business Interruption Loss to Contracts in Force at the Time of the Fires.**

72.    XL's next argument, which it raised in July-August 2022, was that Bryce was not permitted to claim Business Interruption loss in the Period of Indemnity (or Indemnity Period) based on its expectation that it would have expanded business with its roster of clients in that period, which it could have served with its available capacity.

73.    In fact, under applicable law, Bryce is entitled to claim Business Interruption loss for all the profit it would have earned in the Period of Restoration and Extended Period of Restoration (or the Indemnity Period), including that attributable to planned expansion of business in those periods.  As XL was aware, Bryce had agreements in place under which Bryce was going to expand the work that it did for certain of its customers, which expansion was made impossible by the damage from the fires and then by XL's refusal to honor its obligations under the XL Policy.

74.    Specifically, the XL Policy provides that the amount of Business Interruption loss is to be computed by the "probable experience" of Bryce after the loss:

> In determining the amount of Time Element loss as insured by this policy, the experience of the business before the loss and the probable experience thereafter had no such loss occurred shall be considered.

Ex. A at 25 of 52.

75.    This is entirely consistent with the burden of proof for Time Element losses under New York law:  they must be demonstrated with "reasonable precision," with recovery being barred only for those losses that are based solely on "speculation."  *See, e.g.*, *7001 E. 71st St. LLC v. Cont'l Cas. Co.*, Nos. 13-CV-00638 & 13-CV-02898, 2017 WL 6387615, at *6 (E.D.N.Y. Sept. 29, 2017).

76.    Bryce has met this burden of proof.  For instance, in a letter from BRG to XL's forensic accountant J.S. Held on July 14, 2022, BRG detailed the agreement Bryce reached with PepsiCo's Frito-Lay Division ("PepsiCo"), for production of approximately one hundred billion square inches of product, worth $16,000,000.  This memorandum detailed how PepsiCo withdrew approximately one-half of this business in the wake of fires, because the resultant damage limited Bryce's ability to meet PepsiCo's production needs.  BRG's June 3, 2022 Lost Sales memorandum further detailed, on a client-by-client basis, a total of $60,000,000 in Bryce's lost sales to clients existing at the time of the fires.  In response to questions from J.S. Held, BRG provided a further memorandum on July 20, 2022, supporting the accuracy of the projection of the business from PepsiCo.

77.    Despite this, J.S. Held never responded, and ultimately informed Bryce that XL had forbidden it from considering lost increases in performance from agreements such as that described above.  XL's position is wholly inconsistent with the XL Policy, controlling law, custom and practice in the insurance industry, and its duty of good faith and fair dealing.

> **(iv)    XL Issued a Reservation of Rights Repeating Its Unsupported Excuses for Failing To Pay Bryce in a Timely Manner.**

78.    On August 2, 2022, XL sent a reservation of rights letter to Bryce.

79.    This letter first again justified XL's refusal to pay Bryce's full Time Element loss on the argument that XL is entitled to confine Bryce's Time Element recovery to a Gross Profit

basis, but did not provide any factual or legal support for that position, as it had repeatedly promised to do. XL has never provided Bryce with this support.

80.    XL then stated that, despite this, it was reviewing Bryce's loss on both a Gross Profits and Gross Earnings basis, but XL has refused, as of the date of this Complaint, to share with Bryce the results of that review. XL has since orally reversed itself on this position, as well, first refusing to share its calculations of Bryce's loss on a Gross Earnings basis and, thereafter, instructing J.S. Held not to do a calculation of Bryce's loss on a Gross Earnings basis.

81.    In the reservation of rights letter, XL next again relied on its argument that it was not obligated to pay for any loss "for which no contract was in place at the time of or before the loss," but offered no factual or legal support for this argument other than the tautological statement that the XL Policy covers "actual loss sustained."

82.    XL closed by asserting the application of certain exclusions without identifying the factual or legal reasons why those exclusions might apply.

### (v)    XL Next Asserted Bryce Could Not Claim Business Interruption Loss Attributable to Lost Ability To Expand Business with Existing Clients Because It Was at Maximum Capacity at the Time of the Fires.

83.    XL's next proffered excuse for failing to pay Bryce's lost Business Interruption loss in full was that, at the time of the fires, Bryce was operating and full capacity, and therefore could not have expanded business with its existing clients, and thus could not claim Business Interruption loss on the basis of expanded business.

84.    While XL's new position seemingly accepts that Bryce could claim losses on the basis of probable expansions of business for which there were no written contracts at the time of the fires, it was wrong as a matter of fact, as BRG demonstrated by memorandum of September 30, 2022. In response to BRG's memorandum, XL's accountants J.S. Held, simply reiterated, without support and in contravention of fact, that Bryce did not have such capacity, and J.S. Held

thereafter repeatedly refused Bryce's repeated demands that it support this assertion with facts or the opinion of an engineer.

> **(vi)** **After Making an Overdue Partial Payment, XL Continued To Refuse To Pay the Full Balance of Bryce's Losses on New and Specious Grounds.**

85.     On October 26, 2022, XL provided an overdue partial payment of $7,427,477 for Bryce's losses.  XL's payment failed to fully compensate Bryce for its loss.

86.     Following receipt of XL's partial payment, Bryce continued to submit invoices, sales data, proof of costs associated with the temporary presses, and other documents demonstrating the full outstanding amount owed by XL.

87.     Inexplicably, on November 2, 2022, XL claimed that Bryce's submissions were "lacking sufficient support needed to validate the claim."

88.     In response, on November 5, 2022, Bryce submitted a revised interim claim submission.  Despite this, XL failed to pay the amounts claimed or offer any satisfactory explanation for its failure to pay, demonstrating the hollowness of its complaints as to the form of the submissions Bryce had made in support of additional payments.

89.     Bryce made its executive and its accountants from BRG available to XL at meetings on November 11, 2022 and December 1, 2022.  During these meetings, Bryce and BRG presented Bryce's claim and answered any questions of XL.  After the December meeting, XL promised to follow up within a week advising of next steps regarding the claim.  XL failed to respond as promised.

90.     Subsequently and through the date of the filing of this Complaint, XL has raised a number of baseless further arguments that have demonstrated to Bryce that XL will not pay its claim in full unless forced to do so by a court of law.

**(c)**    **XL's Inexplicable Delays in Paying Bryce What It Owed under the XL Policy Hindered Bryce's Recovery and Caused Further Loss.**

91.    Bryce has repeatedly requested XL to make advances of its covered Property Damage and Time Element losses so that Bryce could finance the replacement of its damaged presses, pay its continuing expenses, and pay its Extra Expenses and Expenses To Reduce Loss, including for the construction of Plant 10 to house the permanent replacement presses and purchase of the temporary replacement press to mitigate Bryce's ongoing Business Interruption loss.

92.    As discussed above, XL delayed in adjusting Bryce's loss and damage, and delayed approval of the steps Bryce proposed to mitigate its Business Interruption loss, thereby tolling, under applicable law, the inception of the Period of Indemnity (or the Indemnity Period), or entitling Bryce to claim consequential damages for increased periods of loss.

93.    Further, XL has refused timely to advance funds sufficient for Bryce to both pay for its continuing expenses and expenses to clean up its property as well as to finance acquisition of temporary and permanent replacement presses, thereby increasing Bryce's losses.

94.    To date, XL has made only piecemeal advances amounting to less than one third of Bryce's total covered loss.

95.    XL's failure to advance sufficient amounts to reimburse Bryce for the foregoing covered losses so that it can repair its two facilities and return its business to the condition in which it was operating prior to the two fires constitutes a breach of contract.

96.    Bryce repeatedly asked that XL commit to a timeline for resolving the claim.  XL failed to commit to a timeline although it was aware of the continuing harm to Bryce caused by XL's delays in resolving the claim.

97.    Further, XL's breach of contract has caused Bryce to incur additional consequential damages, which were foreseeable at the time XL sold the XL Policy (and at the time XL breached

the XL Policy) and which flow naturally from XL's breach. These consequential damages include, but are not limited to, additional Business Interruption losses, additional interest on loans, costs to renegotiate loan terms, penalties and fees associated with inability to comply with payment terms for replacement presses, additional costs associated with vendor contracts, missed vendor discounts forfeited for lack of ready cash, and missed investment opportunities.

98.    XL's repeated delays in fully and fairly adjusting Bryce's claim, and XL's delays in paying amounts it knows it owes on a timely basis to a policyholder it knows has been and is in desperate financial condition due to the losses caused by the two fires, constitute bad faith conduct, in violation of Tennessee and New York law.

99.    As a result of XL's wrongful refusal to pay covered losses in breach of the XL Policy, Bryce has suffered damage and will continue to suffer damage.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

100.    Bryce incorporates by reference the allegations contained in paragraphs 1-99.

101.    As set forth above, XL sold Bryce the XL Policy protecting Property Damage and Time Element loss suffered by Bryce as a result of fires.

102.    XL breached and continues to breach its promises, as set forth in the XL Policy, by, among other things, failing and/or refusing to honor its promises to pay for Bryce's Property Damage and Time Element losses, and other losses covered under the XL Policy.

103.    As a direct and proximate result of XL's breaches of contract and refusal to acknowledge its coverage obligations, Bryce has suffered and will continue to suffer serious harm in an amount in excess of $75,000, exclusive of interest and costs.

104.    An actual and justiciable controversy exists between Bryce and XL regarding the interpretation, application and meaning of the XL Policy.

105.    Accordingly, Bryce is entitled to declaratory judgment of its rights and of the obligations of XL under the XL Policy.

106.    Declaratory relief from this Court will resolve all outstanding issues between Bryce and XL under the XL Policy.

WHEREFORE, pursuant to 28 U.S.C. §§ 2201-02, Bryce seeks judgment in its favor as to Count I as follows:

a)    A declaration that Bryce suffered loss, damage and/or costs covered under the XL Policy;

b)    The entry of an Order declaring that XL must pay Bryce for Property Damage and Time Element loss incurred as a result of Property Damage including that suffered in the period where XL purported to adjust the claim and wrongfully withheld insurance money, and for all additional coverages provided under the XL Policy; and

c)    The award of such additional relief as the Court deems just and appropriate.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

107.    Bryce incorporates by reference the allegations contained in paragraphs 1-106.

108.    Bryce has incurred, and will incur in the future, Property Damage, Business Interruption loss, Extra Expenses, Expenses To Reduce Loss and other covered loss or damage due to the fires that impacted Bryce's operations and XL's delays in adjusting and paying those losses.

109.    In breach of the XL Policy, XL refused or otherwise failed to indemnify Bryce for its loss, damage and/or costs, thereby causing damage to Bryce as well as consequential damages flowing naturally from XL's breaches.

WHEREFORE, Bryce seeks judgment in its favor as to Count II as follows:

a) The entry of an award requiring XL to pay Bryce all monetary damages suffered by Bryce caused by XL's breaches, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs; and

b) The award of such additional relief as the Court deems just and appropriate.

### THIRD CAUSE OF ACTION
### (Bad Faith)

110.    Bryce incorporates by reference the allegations contained in paragraphs 1-109.

111.    Under the XL Policy, XL owes Bryce a duty of good faith and fair dealing in all of its actions towards Bryce regarding insurance coverage for the fires.

112.    XL's actions led Bryce to rely on XL's timely indemnity of the covered losses resulting from the fires.

113.    XL's failure timely to indemnify Bryce for covered losses under the XL Policy materially harmed Bryce and continues materially to harm Bryce.

114.    As noted in greater detail above, Bryce promptly notified XL of its claims for covered loss and damage caused by the Searcy Fire and Memphis Fire, thereby satisfying Bryce's duties under the XL Policy.

115.    For more than 15 months, XL has delayed and continues to delay indemnifying Bryce for its covered loss and damage, only advancing small amounts of funds to Bryce as Bryce attempted to mitigate its covered loss and damages from the fires.

116.    On March 23, 2022, XL notified Bryce for the first time that it would only indemnify Bryce for Business Interruption and thus related Time Element losses on a Gross Profits rather than Gross Earnings basis.  When XL first raised this argument, Bryce discovered that XL had replaced the Business Interruption provision that it had included in policies XL had sold to Bryce from 2013 to 2020 with a far more restrictive provision and that XL, in bad faith and

contrary to its obligations under controlling law, had not informed Bryce of this change, rendering it unenforceable.

117.    XL further acted in bad faith when it informed Bryce that it had not advanced sufficient money for Bryce to pay for replacement presses and to indemnify Bryce for cleanup costs and unavoidable continuing expenses, but that Bryce should somehow have allocated XL's inadequate advances to paying for the presses.

118.    Subsequently, XL acted in bad faith by raising, seriatim, meritless arguments in order to delay and minimize its payments to Bryce, causing Bryce to incur additional costs and losses.

119.    XL's conduct violates Tenn. Code § 56-7-105 in that it has acted in bad faith towards its policyholder and in its own self-interest, and has violated the duty of good faith and fair dealing it owes to the Bryce.  XL has similarly violated its duty of good faith and fair dealing under New York law.

120.    XL's conduct was intentional, designed to inflict injury on Bryce, and taken with malice and ill will toward Bryce in derogation of XL's obligations under the XL Policy, and contrary to Bryce's interests.

WHEREFORE, Bryce seeks judgment in its favor as to Count III as follows:

a) The entry of an award requiring XL to pay Bryce all monetary damages suffered by Bryce caused by XL's bad faith, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs;

b) The entry of an award of punitive damages; and

c) The award of such additional relief as the Court deems just and appropriate.

Respectfully submitted,

Dated:  March 2, 2022

REED SMITH LLP

By:  /s/John N. Ellison
John N. Ellison
Richard P. Lewis
599 Lexington Avenue
New York, NY 10022
T:  (212) 521-5400
F:  (212) 521-5450
jellison@reedsmith.com
rlewis@reedsmith.com

Elizabeth F. Vieyra
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
T:  (215) 851-8100
F:  (215) 851-1420
evieyra@reedsmith.com

*Attorneys for Plaintiff*

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues properly so tried.

Dated: March 2, 2022                    REED SMITH LLP


                                        By: _s//John N. Ellison_____
                                            John N. Ellison
                                            *Attorneys for Plaintiff*