UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRYCE CORPORATION,

                          Plaintiff,

                -v.-

XL INSURANCE AMERICA, INC.,

                          Defendant.

---

23 Civ. 1814 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Bryce Corporation is the holder of an all-risk commercial property policy issued by Defendant XL Insurance America for the period spanning June 15, 2021, to June 15, 2022 (the "XL Policy"). Plaintiff filed the instant lawsuit challenging Defendant's performance of its obligations under the XL Policy, and Defendant filed two motions seeking to limit that lawsuit. The first motion is Defendant's partial motion to dismiss Count Three of the First Amended Complaint (the "FAC") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). At a high level, Defendant maintains that the XL Policy's choice-of-law provision precludes Plaintiff's extra-contractual claim of bad faith, requiring its dismissal. The second motion is Defendant's motion to strike a loss run document (the "Loss Run") incorporated as an exhibit to the FAC, as well as the FAC's allegations relying on the Loss Run. On this point, Defendant argues that the Loss Run is protected by the work product doctrine, and therefore cannot be relied upon by Plaintiff in the FAC.

Plaintiff opposes both motions, first asserting that Defendant's motion to dismiss is predicated on an erroneous interpretation of the Policy's choice-of-law provision, and then asserting that the Loss Run is not protected by the work product doctrine and was therefore properly incorporated into the FAC. For the reasons set forth herein, the Court agrees with Plaintiff on both fronts, and therefore denies Defendant's motions to dismiss and to strike.

## BACKGROUND[1]

### A.  Factual Background

#### 1.  The Parties and Plaintiff's Claims Under the XL Policy

Plaintiff Bryce Corporation is a Tennessee corporation maintaining its principal place of business in Memphis, Tennessee.  (FAC ¶¶ 3, 7).  Plaintiff is engaged in the production of flexible packaging for applications in the food, snack, pet care, household, and health and beauty industries.  (*Id.* ¶ 7). Defendant XL Insurance America, a national insurance carrier located in Dallas, Texas, sold Plaintiff the XL Policy, covering the period from June 15, 2021, to June 15, 2022.  (FAC ¶ 1; *see also* XL Policy (Dkt. #18-1) at 17).  The

---

[1]  With respect to Defendant's motion to dismiss, this Opinion draws its facts from the First Amended Complaint (the "FAC" (Dkt. #18)), the well-pleaded allegations of which are taken as true on this motion, as well as the XL Policy that is incorporated by reference therein.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106-07 (2d Cir. 2021) (describing materials extraneous to the pleadings that courts may consider on a motion to dismiss).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. MTD Br." (Dkt. #26); Plaintiff's memorandum of law in opposition to Defendant's motion to dismiss as "Pl. MTD Opp." (Dkt. #35); and Defendant's reply memorandum of law as "Def. MTD Reply" (Dkt. #39).  Separately, the Court refers to Defendant's memorandum of law in support of its motion to strike as "Def. Strike Br." (Dkt. #37); Plaintiff's memorandum of law in opposition to Defendant's motion to strike as "Pl. Strike Opp." (Dkt. #40); and Defendant's reply memorandum of law as "Def. Strike Reply" (Dkt. #42).

XL Policy was issued to Plaintiff at its business address in Memphis, Tennessee, and provided all-risk commercial property coverage for, among other things, all "real property in which [Plaintiff] has an insurable interest, and personal property owned by the [Plaintiff]."  (XL Policy 19, 30-33).

In November 2021, Plaintiff's locations in Searcy, Arkansas and Memphis, Tennessee suffered fires; these fires, in turn, damaged the large, specialized printing presses within Plaintiff's facilities that are required for its production lines.  (FAC ¶¶ 9-11).  Plaintiff timely submitted to Defendant claims for its losses arising from these fires.  (*Id.* ¶¶ 9-13, 38-39).  After receiving Plaintiff's notices of claim, on December 29, 2021, Defendant authorized a $5,000,000 advance to Plaintiff in connection with the Searcy Fire, and a $4,000,000 advance in connection with the Memphis Fire.  (*Id.* ¶ 51).  On October 26, 2022, XL issued an additional payment to Plaintiff in the amount of $7,427,477.  (*Id.* ¶ 86).

Notwithstanding these payments, negotiations between the parties broke down after Plaintiff demanded additional coverage under the XL Policy, which demands Defendant is alleged to have either improperly denied outright, or approved only after an unreasonable delay.  In particular, Plaintiff alleges that Defendant breached the terms of the XL Policy by refusing to cover the full cost of obtaining replacement presses for those damaged by the Searcy and Memphis Fires.  (FAC ¶¶ 41-49).  Plaintiff also claims that Defendant breached the Policy by belatedly granting certain approvals for expenditures made by Plaintiff for purposes of recovering from the effects of the fires and mitigating

business interruption losses suffered in connection with the fires.  (*Id.*).

Finally, Plaintiff alleges that Defendant acted in bad faith by delaying the

negotiation process with respect to Plaintiff's claims under the XL Policy, and

by representing to Plaintiff that the indemnity reserves maintained by

Defendant in connection with Plaintiff's claims were far smaller than the

amount actually accounted for by Defendant.  (*Id.* ¶¶ 101-107).

### 2. Disclosure of the XL Loss Run to the Stephens Brokerage[2]

After the events of the Searcy and Memphis fires, but before the filing of

this litigation, Plaintiff's third-party insurance broker, Stephens Insurance,

LLC ("Stephens"), sought to renew Plaintiff's property insurance coverage with

Defendant.  In connection with the renewal, Sarah Goolsby, a Senior Account

Manager at Stephens, requested a "loss run" for the XL Policy.  (Declaration of

Raymond F. Walton ("Walton Decl." (Dkt. #38-1)) at ¶ 3; Affidavit of Sarah K.

Goolsby ("Goolsby Decl." (Dkt. #41-2)) at ¶¶ 3-4).  Broadly speaking, a loss run

is a report that shows the history of claims made against an insurance policy.

(FAC ¶ 102).  *See generally XL Specialty Ins. Co.* v. *Prestige Fragrances, Inc.*,

---

[2] With respect to Defendant's motion to strike, to which this section pertains, courts generally "will not consider matters outside the pleadings, and well-pleaded facts will be accepted as true."  *See Index Fund, Inc.* v. *Hagopian*, 107 F.R.D. 95, 100 (S.D.N.Y. 1985); *see also* 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1380 (3d ed. 2004) ("Matter outside the pleadings normally is not considered on a Rule 12(f) motion; for example, affidavits in support of or in opposition to the motion typically may not be used.").

Here, however, Defendant's basis for striking certain allegations in the FAC rests principally on its assertion that those allegations derive exclusively from the Loss Run, which Defendant maintains is subject to attorney work product protection and therefore inadmissible.  (*See, e.g.*, Def. Strike Br. 1).  Accordingly, the Court recites the relevant facts contained in the sworn statements of the parties submitted in connection with the motion to strike and considers these facts solely to the extent they weigh on the Court's determination regarding the admissibility *vel non* of the Loss Run.

420 F. Supp. 3d 172, 178 n.6 (S.D.N.Y. 2019) ("A loss run is a report generated by an insurance company that gives the loss history; it will show claims made, [and] claims actually paid." (internal quotation marks and citations omitted)). In the renewal context, the information contained in a loss run may inform an insurer's decision with respect to the premium it will charge for the renewed policy. *See id.* ("Insurers typically seek loss history information because this data helps carriers in rating risk.").

On January 17, 2023, an XL underwriting assistant sent the Loss Run to Goolsby, which document is the subject of Defendant's motion to strike. (*See* FAC, Ex. B (Loss Run); Walton Decl. ¶¶ 4-5). The Loss Run contained a history of Plaintiff's claims dating back to 2011, with columns providing information on the amount of each claim as well as the total amount paid out by Defendant. (*See generally* Loss Run). Additionally, the Loss Run contained five columns of information reflecting Defendant's reserves pertaining to indemnities and expenses (the "Reserve Information"), as well as other information reflecting costs incurred by Defendant and its corresponding loss ratio. (*See id.* at 2). As a general matter, such reserve information represents an estimate by the insurer of amounts that might be incurred in connection with open claims. (FAC ¶ 102).

Later that day, after discovering that the Loss Run had been disclosed to Goolsby, Alan Jeffcoats, an underwriter employed by Defendant, contacted Goolsby and another Stephens employee to advise them that "the loss run sent earlier was 'incorrect because [it] reflected IBNR and Reinsurance, which are

Internal numbers.'" (Walton Decl. ¶¶ 4, 6).  To remedy the problem, Jeffcoats

provided a replacement loss run, which version omitted the columns

containing the Reserve Information.  (*Id.* ¶ 6).

No further communications were had with respect to the Loss Run until

June 5, 2023, when counsel for Plaintiff, citing the Reserve Information

contained in the Loss Run, demanded that Defendant "resolve this case 'at the

indemnity reserve [Defendant] is currently carrying.'" (Walton Decl. ¶ 7).  That

same day, Defendant responded to Plaintiff's request, asserting for the first

time that the Reserve Information contained in the Loss Run was "confidential,

irrelevant, and privileged," and demanding that "versions of the Loss Run

including the indemnity and expense reserve columns be destroyed or

returned, and … precluded from use in the litigation." (Declaration of Mark L.

Deckman ("Deckman Decl." (Dkt. #38-5)), Ex. E)).  Undeterred, Plaintiff filed

the FAC on June 22, 2023, into which pleading Plaintiff incorporated the Loss

Run (and Reserve Information) in support of Plaintiff's claim of bad faith.  (*See*

*generally* FAC ¶¶ 118-130; *id.*, Ex. B).  Plaintiff maintains that the Reserve

Information is evidence of Defendant's true assessment of the value of

Plaintiff's claims, and therefore probative of Defendant's bad faith in asserting

certain defenses to coverage in the negotiations between the parties.  (*Id.*

¶ 127).

## B.    Procedural Background

On March 2, 2023, Plaintiff filed a three-count complaint seeking

declaratory relief, damages for breach of contract, and damages in connection

with violations of Section 56-7-105 of the Tennessee Insurance Code.  (*See* Dkt. #1 ("Compl.") ¶¶ 100-120).  On June 5, 2023, Defendant filed a pre-motion letter seeking leave to file a partial motion to dismiss Count Three of the complaint under Rule 12(b)(6), and Plaintiff submitted its response in opposition on June 14, 2023.  (Dkt. #11, 15).  Additionally, on June 22, 2023, Plaintiff filed its FAC, the operative pleading in this matter, reflecting the addition of the Loss Run as discussed above.  (Dkt. #18 (FAC), 18-2 (Loss Run)).

Thereafter, the Court held a conference on June 23, 2023, addressing the parties' proposed case management plan with respect to Counts One and Two of the FAC; the parties' pre-motion letters with respect to Defendant's anticipated motion to dismiss Count Three of the FAC; and Defendant's objections to inclusion of the Loss Run in support of allegations in the FAC.  (*See* June 23, 2023 Minute Entry).  At that conference, the parties agreed to proceed with briefing on the motion to dismiss, and Defendant expressed its intent to move to strike the allegations in the FAC that relied on the Loss Run.

Following the June 23, 2023 conference, briefing on the motion to dismiss and the motion to strike proceeded in parallel.  On July 28, 2023, Defendant filed its motion to dismiss and accompanying memorandum of law.  (Dkt. #25, 26).  On August 31, 2023, Plaintiff filed its response in opposition.  (Dkt. #35).  Finally, on September 15, 2023, Defendant filed its reply in further support of its motion to dismiss.  (Dkt. #39).

Separately, on July 28, 2023, Defendant filed a pre-motion letter seeking leave to file a motion to preclude Plaintiff from relying on the Loss Run, and to strike all allegations in the FAC that derived from the information in the Loss Run. (Dkt. #28). Plaintiff filed its response in opposition on August 2, 2023, and the Court held a pre-motion conference regarding the submissions on August 9, 2023. (Dkt. #29 (Plaintiff's response); August 9, 2023 Minute Entry). Defendant then filed its motion to strike and accompanying memorandum of law on September 8, 2023, and Plaintiff filed its response in opposition on October 11, 2023. (Dkt. #36, 37, 40). Briefing concluded on November 1, 2023, when Defendant filed its reply in further support of its motion to strike. (Dkt. #42).

## DISCUSSION

**A.    The Court Denies Defendant's Motion to Dismiss**

**1.    Applicable Law**

**a.    Motions to Dismiss under Rule 12(b)(6)**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). "While *Twombly* does not require heightened fact pleading of

specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alteration adopted; internal quotation marks and citation omitted); *see also Hamilton* v. *Westchester Cnty.*, 3 F.4th 86, 90-91 (2d Cir. 2021) (explaining that on a motion to dismiss, "[w]e accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations" (internal quotation marks and citation omitted)).

### b.   Interpretation of Insurance Contracts Under New York Law

"Insurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation." *Porco* v. *Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (internal quotation marks omitted) (citing *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001)). An insurance contract must be interpreted "so that a clear and unambiguous policy provision is given its plain and ordinary meaning." *Dalton* v. *Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 90 (2d Cir. 2009) (citation omitted). Ambiguity exists when "the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business." *Morgan Stanley Grp. Inc.* v. *New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks and citation omitted). "[W]here a contract's language is clear and unambiguous," a court may properly address issues of its interpretation in connection with a Rule 12(b)(6) motion to dismiss. *Wells Fargo Bank, N.A.* v. *Bank of Am., N.A.*, No. 11 Civ. 4062 (JPO), 2013 WL 372149, at *4 (S.D.N.Y. Jan. 31, 2013) (quoting *Maniolos* v. *United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010)); *see also Orchard Hill Master Fund Ltd.* v. *SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous.").

### 2. The Choice-of-Law Provision Unambiguously Excludes Extra-Contractual Claims

Defendant's argument in favor of dismissal rests principally on its proffered interpretation of the choice-of-law provision in the XL Policy. In particular, Defendant argues that Plaintiff's bad-faith claim brought under the Tennessee Insurance Code must be dismissed, as the choice-of-law provision in the XL Policy dictates that New York law applies to all disputes arising between the parties in connection with the XL Policy, and that New York has no statutory analogue for the Tennessee statute. (Def. MTD Br. 1, 5-9). Plaintiff vigorously disputes Defendant's interpretation of the choice-of-law provision,

and argues instead that its text unambiguously excludes extra-contractual claims, such as Plaintiff's bad-faith claim.  (Pl. MTD Opp. 5-10).

Neither party disputes that the Court must analyze the XL Policy and its choice-of-law provision according to New York law.  (Def. MTD Br. 4-5; Pl. MTD Opp. 4-5).  *See Fin. One Pub. Co.* v. *Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332-33 (2d Cir. 2005) ("The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." (citation omitted)).  To that end, while New York law provides that contractual choice-of-law provisions are valid and given full effect, *see Krock* v. *Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996), New York courts construe such clauses narrowly with respect to extra-contractual causes of action, *see Fin. One Pub. Co.*, 414 F.3d at 335 (noting "a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action").  Only where the "express language" of a choice-of-law provision is "'sufficiently broad' as to encompass the entire relationship between the contracting parties," will New York law require a court to "apply [that provision] to claims … arising incident to the contract."  *Krock*, 97 F.3d at 645 (quoting *Turtur* v. *Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)).

"As a general rule of thumb, provisions applying to disputes 'arising out of' or 'relating to' a contract are capacious enough to reach [extra-contractual] claims, while provisions stating that a contract will be 'governed by' or

'construed in accordance with' the law of a state are not." *Ramiro Aviles* v. *S&P Global, Inc.*, 380 F. Supp. 3d 221, 270-71 (S.D.N.Y. 2019) (quoting *Chigirinskiy* v. *Panchenkova*, No. 14 Civ. 4410 (JPO), 2015 WL 1454646, at *6 (S.D.N.Y. Mar. 31, 2015)); *see also Refco Grp. Ltd., LLC* v. *Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA), 2014 WL 2610608, at *40 (S.D.N.Y. June 10, 2014) ("Unlike choice-of-law provisions that apply to disputes 'arising out of' or 'relating to' a contract, those that provide that the contract will be 'governed by' or 'construed in accordance with' the law of a particular state are not sufficiently broad to reach" extra-contractual claims. (quoting *Drenis* v. *Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006))).

The XL Policy's choice-of-law provision reads in relevant part:

> The Insured and the Company further agree that New York law shall control the interpretation, application and meaning of this contract, whether in suit or otherwise.

(XL Policy 56-57). This provision maps neatly onto the sort of contractual language that courts applying New York law have held to be insufficient to extend to extra-contractual disputes, such as Plaintiff's bad-faith claim, that arise in connection with the contract. *See Warman* v. *Am. Nat'l Standards Inst.*, No. 15 Civ. 5486 (RA), 2016 WL 3676681, at *3 (S.D.N.Y. July 6, 2016) ("[A] choice of law provision indicating only that an *agreement* will be governed by New York law will not bind the parties for non-contractual clauses of action."); *Drenis*, 452 F. Supp. 2d at 426 (holding that fraudulent-conveyance claim arising in connection with transactions made under the terms of a

contract was not governed by a contract term dictating that the contract "shall be governed by, and construed in accordance with," Delaware law). Accordingly, the Court finds that the plain language of the choice-of-law provision contained in the XL Policy does not extend to Plaintiff's bad-faith claim under Tennessee law.[3]

Such a conclusion is bolstered by the text of the adjacent forum-selection provision, which reads in relevant part:

> In the event that any disagreement arises between the Insured and the Company requiring judicial resolution, the Insured and the Company each agree that any suit shall be brought and heard in a court of competent jurisdiction within the State of New York.

(XL Policy 56). When considered together, the choice-of-law clause and the forum-selection clause use two different formulations with respect to their scope, which distinction this Court is bound to respect. *Cf. Law Debenture Trust Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("[W]here consideration of the contract as a whole will remove the ambiguity

---

[3]     Relatedly, the Court is not moved by Defendant's argument about the interrelationship between bad-faith claims and coverage actions. For one, this conclusory argument is supported by a single citation to a case from the Western District of Tennessee, contained in a footnote of Defendant's opening brief and reply. (*See* Def. MTD Br. 8 n.3 (citing *Richards* v. *State Farm Fire & Cas. Co.*, 585 F. Supp. 3d 1083, 1091 (W.D. Tenn. 2022)); Def. MTD Reply 6 n.1 (same)). Moreover, the *Richards* case reflected only that court's conclusion that an insurance company's refusal to pay was not made in bad faith, as it had "substantial legal grounds that the policy [did] not afford coverage for the alleged loss." 585 F. Supp. 3d at 1091. In reaching its conclusion, the *Richards* court observed that this lack of bad faith was sufficient to negate a critical element of the *prima facie* case for bad-faith insurance denial under Tennessee law. *Id.* The court did not, however, endorse Plaintiff's broader pronouncement that the liability under the Tennessee statute is always predicated on first establishing a right to recovery under the insurance policy itself.

created by a particular clause, there is no ambiguity." (quoting *Readco, Inc.* v. *Marine Midland Bank*, 81 F.3d 295, 300 (2d Cir. 1996))).

Of note, the choice-of-law clause specifies the application of New York law only to the "interpretation, application and meaning" of the XL Policy. (XL Policy 57).  By contrast, the forum-selection clause provides that "any disagreement" arising between Plaintiff and Defendant shall be heard in the State of New York.  (*Id.* at 56).  This distinction illustrates that "[t]he drafters were capable of writing a choice-of-law provision sufficiently broad to cover [extra-contractual claims] by mimicking the adjacent forum selection clause, but chose not to do so."  *See J&R Multifamily Grp., Ltd.* v. *U.S. Bank Nat'l Ass'n*, No. 19 Civ. 1878 (PKC), 2019 WL 6619329, at *4 (S.D.N.Y. Dec. 5, 2019).  For this reason, the Court declines to rewrite the policy on their behalf.  *Accord Hartford Fire Ins. Co.* v. *Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

Defendant's competing interpretation of the XL Policy's choice-of-law provision draws heavily on *Wayne County Airport Authority* v. *Allianz Global Risks United States Insurance Co.*, in which a court in the Eastern District of Michigan analyzed an identical choice-of-law provision and found that New York law applied to all of the plaintiff's claims arising out of a series of insurance policies.  *See* No. 11 Civ. 15472 (DPH), 2013 WL 4426451 (E.D. Mich. Aug. 14, 2013).  Defendant's reliance on that case, however, rests on

Defendant's incorrect assumption that, because the policy language is similar in both cases, the *Wayne County Airport Authority* court "fielded the exact inquiry facing this Court."  (Def. MTD Reply 3).

Closer examination of *Wayne County Airport Authority* reveals that the court in that case analyzed the choice-of-law provision under Michigan choice-of-law principles, and focused primarily on the "balanc[ing] [of] the expectations of the parties to the contract and the relevant states' interests." 2013 WL 4426451, at *7 (citing *Mill's Pride* v. *Cont'l Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002)).  The Michigan approach conflicts with the clear directive under New York law that courts must first consider and enforce a choice-of-law provision as understood by its plain text, and only resort to extra-contractual approaches after finding such text to be ambiguous.  *See Dalton*, 557 F.3d at 90 (holding that an insurance contract must be interpreted "so that a clear and unambiguous policy provision is given its plain and ordinary meaning" (citation omitted)).  And as discussed above, New York courts interpreting similar language under New York law have found that such language unambiguously excludes extra-contractual claims.  *See, e.g.*, *Ramiro Aviles*, 380 F. Supp. 3d at 271 (collecting cases).

Accordingly, the Court rejects Defendant's attempts to stretch the plain meaning of the XL Policy's choice-of-law provision beyond its unambiguous scope.  As detailed above, the choice-of-law provision does not extend to encompass extra-contractual claims, including Plaintiff's bad-faith claim under Tennessee law.  Because Defendant's arguments in favor of dismissal rest

exclusively on this incorrect interpretation of the choice-of-law provision, its motion must be denied.  As a final matter, the Court briefly notes that Defendant has not addressed whether New York's choice-of-law analysis would require Plaintiff's bad-faith claim to be dismissed, nor has Defendant responded to Plaintiff's analysis concluding that Tennessee law applies. (Pl. MTD Opp. 10 n.6).  Accordingly, the Court finds that Defendant has waived those arguments with respect to the instant motion to dismiss.

## B.      The Court Denies Defendant's Motion to Strike

### 1.      Applicable Law

#### a.      Motions to Strike Under Rule 12(f)

Pursuant to Rule 12(f), "[t]he court may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  When considering a motion to strike, the Court must "deem the non-moving party's well-pleaded facts to be admitted, draw all reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying the motion to strike."  *Jujamcyn Theaters LLC* v. *Fed. Ins. Co.*, 659 F. Supp. 3d 372, 383 (S.D.N.Y. 2023) (citation omitted).  "Courts in this District have found that to prevail on a motion under Rule 12(f), the moving party must show that '[i] no evidence in support of the allegations would be admissible; [ii] that the allegations have no bearing on the issues in the case; and [iii] that to permit the allegations to stand would result in prejudice to the movant.'"  *Trodale Holdings LLC* v. *Bristol Healthcare Invs., L.P.,* No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *15 (S.D.N.Y. Nov. 29, 2017) (quoting *Landesbank Baden-*

*Württemberg* v. *RBS Holdings USA, Inc.*, 14 F. Supp. 3d 488, 497 (S.D.N.Y. 2014) (internal quotation marks and citation omitted)).

Motions to strike "are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Smith* v. *AVSC Int'l, Inc.*, 148 F. Supp. 2d 302, 317 (S.D.N.Y. 2001). Ultimately, whether or not to grant a motion to strike is committed to the sound discretion of the district court. *See, e.g.*, *Holland* v. *Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 275 (S.D.N.Y. 2020) ("Federal Courts have discretion in deciding whether to grant motions to strike." (internal quotation marks omitted) (citing *Capri Sun GmbH* v. *Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. 2019))).

### b. The Attorney Work Product Doctrine

"[T]he work-product doctrine is distinct from and broader than the attorney-client privilege." *In re Grand Jury Proc.*, 219 F.3d 175, 190 (2d Cir. 2000) (citation omitted). The work product doctrine is designed "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States* v. *Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting *Hickman* v. *Taylor*, 329 U.S. 495, 510-11 (1947)). The doctrine protects "factual material, including the result of a factual investigation" — commonly referred to as fact work product — as well as material that "reveals the 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative'" — commonly referred to as opinion work product. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007).

The party asserting work product protection must demonstrate that the material at issue "[i] [is] a document or a tangible thing, [ii] that was prepared in anticipation of litigation, and [iii] was prepared by or for a party, or by his representative." *Allied Irish Banks, P.L.C.* v. *Bank of Am., N.A.*, 252 F.R.D. 163, 173 (S.D.N.Y. 2008) (citation omitted).

### 2. Defendant Has Not Demonstrated a Basis to Strike Plaintiff's Allegations Pertaining to the Loss Run

In its motion, Defendant seeks excision of certain allegations of bad faith contained in the FAC that rely on Reserve Information contained in the Loss Run, which Defendant maintains is inadmissible as work product. (Def. Strike Br. 5, 8). Similarly, Defendant requests that the Court strike the Loss Run itself, attached as Exhibit B to the FAC, and preclude its future use by Plaintiff in connection with the matter. (*Id.* at 8). In further support of its motion to strike, Defendant argues that the Reserve Information contained in the Loss Run has no relevance to the allegations in this case, and that its continued presence in the FAC and elsewhere would prejudice Defendant. (*Id.* at 5; Def. Strike Reply 7-8). For the reasons laid out below, however, the Court finds each of Defendant's arguments to miss the mark.[4]

---

[4]     In its opposition to Defendant's motion to strike, Plaintiff suggests that neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence provide a mechanism to preclude use of the Loss Run, as the Loss Run was obtained outside of discovery. (Pl. Strike Opp. 4-5). As the Court finds that the Loss Run is not protected work product, and alternatively that Defendant waived protection over the Loss Run by disclosing it to Plaintiff's insurance broker, it need not reach Plaintiff's broader arguments about the extent to which either set of Federal Rules may be interpreted to govern the use of materials obtained outside of the formal discovery process.

### a.    The Loss-Run Report Is Admissible

The Court first considers Defendant's argument that the Loss Run is attorney work product, and therefore inadmissible.  As discussed below, the Court finds that Defendant's conclusory allegations about the involvement of counsel in setting the Reserve Information do not suffice to carry Defendant's burden to establish that the Loss Run is protected work product.  Alternatively, Defendant's disclosure of the Loss Run to Stephens resulted in a waiver of work product protection over the document.

As a general matter, "documents prepared in the ordinary course of an insurer's business (which by its nature, involves claim investigation and analysis) are not protected from discovery," even when they are provided to or prepared by counsel.  *OneBeacon Ins. Co.* v. *Forman Int'l, Ltd.*, No. 04 Civ. 2271 (RWS), 2006 WL 3771010, at *5 (S.D.N.Y. Dec. 15, 2006) (alteration adopted; internal quotation marks and citation omitted) (collecting cases).  "Thus, as a general rule, an insurance company's investigation undertaken to determine whether there is coverage, whether [a] claim should be paid, and whether a subrogation claim could be pursued, is not undertaken in anticipation of litigation."  *866 E. 164th St., LLC* v. *Union Mut. Fire Ins. Co.*, No. 16 Civ. 3678 (SN), 2016 WL 6901321, at *1 (S.D.N.Y. Nov. 23, 2016) (internal quotation marks omitted) (citing *Selective Ins. Co. of Am.* v. *Swarey*, No. 07 Civ. 6324 (JWF), 2011 WL 240750, at *1 (W.D.N.Y. Jan. 24, 2011); *Weber* v. *Paduano*, No. 02 Civ. 3392 (GEL), 2003 WL 161340, at *3-4 (S.D.N.Y. Jan. 22, 2003)).

With respect to litigation reserves, in particular, "[t]he factual level of the reserve is not privileged and ... is a business judgment and requirement of New York law." *99 Wall Dev. Inc.* v. *Allied World Specialty Ins. Co.*, No. 18 Civ. 126 (RA) (KHP), 2019 WL 2482356, at *6 (S.D.N.Y. June 14, 2019) (citing N.Y. Ins. Law §§ 1303, 4117).  That said, "[t]he setting of litigation reserves [is] sometimes [] found to be protected from disclosure by the work product doctrine."  *Id.* at *3.  Accordingly, for the work product protection to attach to such litigation reserves, it must be the case that the materials contain sufficient information to reflect that they were prepared in anticipation of litigation, rather than merely to comply with regulatory requirements.  *866 E. 164th St.*, 2016 WL 6901321, at *1 ("[Documents] reflecting only the individual reserve figures and not any underlying methodology or analysis ... are not privileged or otherwise protected.").

Turning first to the Loss Run itself, the Court observes that the document reflects only the Reserve Information and contains no indication of the methodology by which such amounts were calculated or by whom the calculations were run.  Such a document, which "simply states the [reserve] figures without any analysis or opinion," does not suffice to constitute protected work product.  *See 866 E. 164th St.*, 2016 WL 6901321, at *2.  Moreover, the Loss Run was prepared by an individual in Defendant's underwriting department and was sent to Stephens in the context of contract negotiations between the two parties, further suggesting that the document was created in the ordinary course of Defendant's business.  (Walton Decl.

¶¶ 3-5; Goolsby Decl. ¶¶ 4-5).  *See Allied Irish Banks*, 252 F.R.D. at 173 (observing that work product protection is "not available for documents 'that would have been created in essentially similar form irrespective of litigation'" (quoting *Adlman*, 134 F.3d at 1202)).

Nor is the Court persuaded by Defendant's arguments that "the [R]eserve [I]nformation contained in the Loss Run is clearly representative of work product that was created in anticipation of litigation." (Def. Strike Br. 5). Indeed, Defendant's position on the provenance of the Reserve Information is supported primarily by its conclusory assertion that the Reserve Information was "the direct product of communications and advice of counsel in reasonable anticipation of litigation for the purpose of regulatory requirements." (Walton Decl. ¶ 5).  Defendant does not name the counsel responsible for such advice, nor does Defendant provide details regarding the process by which counsel set the Reserve Information, or the events by which Defendant's underwriting department came into possession of the Reserve Information.  Put simply, Defendant's thin claims of privilege do not hold up, as it is well established that "conclusory or *ipse dixit* assertions" cannot "carry [the] 'heavy burden' of demonstrating the applicability of the [work product] privilege."  *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 184 (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984)); *see also Khan* v. *Midland Funding LLC*, 956 F. Supp. 2d 515, 516 (S.D.N.Y. 2013) ("To carry its burden, a party must 'show by affidavit or other competent evidence sufficient facts to bring the disputed documents within the confines of the

privilege.'" (quoting *United States* v. *Davis*, 131 F.R.D. 391, 402 (S.D.N.Y. 1990))).

Defendant is similarly incorrect that the nature of the Reserve Information contained in the Loss Run dictates that it must always be considered protected work product.  (Def. Strike Br. 5-6).  As discussed extensively above, the mere fact of an insurance company's litigation reserves reflects its "opinion on damages.  There is nothing proprietary about such opinions."  *866 E. 164th St.*, 2016 WL 6901321, at *2.  The Court therefore finds that Defendant has not carried its burden to establish that the Loss Run contains attorney work product, such that it would be inadmissible in this action.

And even assuming *arguendo* that such protection would attach to the Loss Run, the facts of this case indicate that Defendant's disclosure of the document to Stephens, Plaintiff's insurance broker, resulted in a waiver of that protection.  For one, courts have observed that disclosure of materials to an insured's broker is almost equivalent to disclosure to the insured, itself, given the agency relationship between an insured and its broker.  *See Cont'l Cas. Co.* v. *Under Armour, Inc.*, 537 F. Supp. 2d 761, 773 (D. Md. 2008) (finding that insurer waived work product protection over materials disclosed to insured's broker, as "[d]isclosure to an agent is tantamount to disclosure to the principal" (citing *Mut. Life Ins. Co. of N.Y.* v. *Hilton-Green*, 241 U.S. 613, 622 (1916)).  (*See* Walton Decl. ¶ 3 (acknowledging that Stephens is "[Plaintiff's] insurance broker and agent")).  Accordingly, Defendant's transmittal of the

Loss Run to Stephens falls squarely in the category of disclosures that "substantially increase[] the opportunity for potential adversaries to obtain the information," which disclosures result in waiver.  *Pilkington N. Am., Inc.* v. *Mitsui Sumitomo Ins. Co. of Am.*, 341 F.R.D. 10, 11 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).

Likewise, Defendant's assertions that it promptly attempted to claw back the Loss Run are belied by the facts, which indicate that Defendant did not formally assert the work product protection over the Loss Run until more than five months after the disclosure, when it became apparent that the Loss Run would be used in this litigation.  It is undisputed that Defendant first disclosed the Loss Run to Stephens on January 17, 2023, in a routine business transaction.  (Walton Decl. ¶ 4).  While Defendant attempted to remedy the disclosure of the Loss Run by providing a replacement version excluding the Reserve Information, Defendant did not at that time expressly assert work product protection over the original Loss Run or the Reserve Information contained therein.  Instead, Defendant attempted to minimize the significance of the initial disclosure by stating that the Loss Run merely "reflected IBNR and Reinsurance, which are Internal numbers."  (*See generally id.* ¶ 6).

In short, nothing in the record provided by the parties in connection with the motion to strike suggests that Defendant expressly ordered the return and/or destruction of the Loss Run in its January 17, 2023 email.  Rather, it was only after counsel for Plaintiff demonstrated its intention to use the Loss Run in this litigation that Defendant formally asserted work product protection

over the document and demanded its return.  (*See* Walton Decl. ¶¶ 8-10).  The record before the Court thus supports a finding of waiver of any applicable protection from disclosure.  *Cf. United States* v. *Schulte*, No. 17 Cr. 548 (JMF), 2022 WL 1284549, at *3 (S.D.N.Y. Apr. 29, 2022) (observing that defendant's six-month delay in asserting privilege over a document contributed to a finding of waiver (citing *Bank Brussels Lambert* v. *Chase Manhattan Bank, N.A.*, No. 93 Civ. 5298 (LMM) (RLE), 1996 WL 944011, at *5 (S.D.N.Y. Dec. 19, 1996) (finding six-month delay in asserting privilege after receiving notice of involuntary disclosure constituted waiver); *Liz Claiborne, Inc.* v. *Mademoiselle Knitwear, Inc.*, No. 96 Civ. 2064 (RWS), 1996 WL 668862, at *5 (S.D.N.Y. Nov. 19, 1996) (finding waiver where counsel waited a month before requesting return of the privileged documents))).

In sum, the Court finds no merit to Defendant's arguments that the Loss Run is covered by the work product doctrine and is therefore inadmissible in the instant case.  As detailed extensively above, the Reserve Information contained in the Loss Run is not work product *per se*, and Defendant's conclusory arguments that the Reserve Information was the product of attorney efforts in anticipation of litigation are unsupported by the facts as laid out in the Defendant's supporting declarations.

### b.    The Loss Run Is Relevant to the Dispute

At the next step of the Rule 12(f) analysis, the Court considers the relevance of the Loss Run to the allegations in the FAC.  *See RBS Holdings USA, Inc.*, 14 F. Supp. 3d at 497.  Defendant maintains that the Loss Run is

irrelevant to the merits of the action, suggesting that "[Defendant's] setting of its reserves as it relates to Plaintiff's claimed losses has no bearing whatsoever on the Court's determination as to whether coverage exists under the plain and unambiguous terms of the Insurance Contract." (Def. Strike Br. 5). Here, too, Defendant's argument incorrectly presupposes that the bad-faith claim would be dismissed from the action. (Pl. Strike Reply 8 n.3).

As the Court has found that Plaintiff's bad-faith claim survive dismissal, it follows that the Loss Run, and the Reserve Information contained therein, is relevant to the dispute. *See Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 138-39 (S.D.N.Y. 2012) (rejecting insurer's position "that reserve information is generally irrelevant in insurance coverage actions"). As other courts have observed, "the actual amounts of [an insurer's] loss reserves" are relevant "to [that insurer's] own beliefs about coverage and [its] liability, as well as [its] good or bad faith in handling and investigating [the insured's] claims." *Id.* (collecting cases). Here, Plaintiff alleges just that, namely that Defendant repeatedly delayed in fully and fairly adjusting Plaintiff's claim, and that the Reserve Information contained in the Loss Run provides evidence of Defendant's valuation of the claim, which valuation exceeded the amount paid out to Plaintiff. (*See* FAC ¶¶ 101-107, 118-130). At this early stage, therefore, the Court cannot foreclose the relevance of the Loss Run. *See Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[O]rdinarily neither a district court nor an appellate court should decide to strike a portion

of the complaint — on the grounds that the material could not possibly be relevant — on the sterile field of the pleadings alone.").

### c.     Use of the Loss Run Would Not Unduly Prejudice Defendant

Having found that the Loss Run is both admissible and relevant, the Court considers finally whether inclusion of the Loss Run in the Amended Complaint would unduly prejudice Defendant.  *RBS Holdings USA, Inc.*, 14 F. Supp. 3d at 497.  On this point, Defendant suggests that failure to strike the Loss Run "would [] undoubtedly result in unfair prejudice to [Defendant] in its defense of this case because [Defendant] would [] be forced to address and respond to irrelevant information that goes beyond the four corners of the plain and unambiguous [XL] Policy."  (Def. Strike Reply 7).  This argument, however, ultimately boils down to Defendant's opinion that it would be prejudiced by being required to address issues and raise other defenses beyond merely those arising from the XL Policy itself.  "Such a defense merely challenges the sufficiency of [Plaintiff's] claims and poses no prejudice."  *Adidas Am., Inc.* v. *Thom Browne, Inc.*, 629 F. Supp. 3d 213, 222 (S.D.N.Y. 2022).

What is more, Defendant's arguments that it would be unduly prejudiced by the introduction of the Loss Run are belied by Defendant's lack of diligence in promptly asserting the work product protection over the document immediately after its initial disclosure.  Had the Loss Run been of such significance to Defendant that its provision to Plaintiff's insurance broker, and thereby to Plaintiff, was unduly prejudicial, Defendant would have more promptly demanded its return, and taken more definitive action than merely

providing a replacement version without the Reserve Information.  Defendant

cannot, after a five-month delay, be permitted to strategically re-engineer its

privilege argument to align with Plaintiff's allegations in this case.  *Cf. In re*

*Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 299 (S.D.N.Y. 2003) ("Parties

should not be permitted to re-engineer privilege logs to align their privilege

assertions with their legal arguments.").

Ultimately, and as discussed extensively above, the Loss Run is both

admissible and relevant to this matter, and its use by Plaintiff does not unduly

prejudice Defendant.  Therefore, it is properly incorporated into the FAC as

Exhibit B.  Relatedly, Plaintiff's FAC allegations reflecting the Reserve

Information contained in the Loss Run are admissible, relevant, and do not

unduly prejudice Defendant.  The Court finds, therefore, that Defendant has

failed to establish its entitlement to relief under Rule 12(f).  *See Corr. Officers*

*Benevolent Ass'n of Rockland Cnty.* v. *Kralik*, 226 F.R.D. 175, 177 (S.D.N.Y.

2005) (noting that motions to strike under Rule 12(f) "are generally disfavored

and will not be granted unless the matter asserted clearly has no bearing on

the issue in dispute").

**CONCLUSION**

For the reasons enumerated herein, Defendant's motion to dismiss is hereby DENIED.  Defendant's motion to strike is also DENIED.  The Clerk of Court is directed to terminate the pending motions at docket numbers 25 and 36.

SO ORDERED.

Dated:   December 28, 2023
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge